**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**NANCY INFIELD**, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

**CARGURUS, INC.**

*Defendant*.

**Case No.**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Nancy Infield ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against CarGurus, Inc. ("CarGurus" or "Defendant").

## NATURE OF THE ACTION

1. This is a class action for damages with respect to CarGurus for its failure to exercise reasonable care in securing and safeguarding its customers' sensitive personal data, collectively known as Personally Identifiable Information ("PII" or "Private Information").

2. This class action is brought on behalf of CarGurus' customers and users of its Website, CarGurus.com ("the Website"), whose sensitive PII was stolen by cybercriminals in a Data Breach of CarGurus' systems in February 2026 (the "Data Breach" or "the Breach").

3. Plaintiff learned of the Breach by receiving notifications from a variety of data security websites, including DataBreach.com[1], HaveIBeenPwned.com[2], and OmniWatch.com.[3]

[1] *See* Exhibit 1.
[2] *See* Exhibit 2.
[3] *See* Exhibit 3.

4. Upon information and belief, CarGurus has not yet acknowledged the Data Breach, either publicly or by notifying affected consumers.

5. Upon information and belief, the type of Private Information that may have been exposed in the Breach include but is not limited to full names, phone numbers, physical addresses, email addresses, and financial information.[4] However, without any notice or information provided by Defendant, Plaintiff and Class members are concerned that additional highly sensitive PII, including their Social Security numbers, was included in the Breach.

6. As a result of the Breach, Plaintiff and other Class members have experienced or will experience various types of misuse of their PII in the coming years, including but not limited to unauthorized credit card charges, unauthorized access to email and other personal accounts, and other fraudulent use of their financial accounts.

7. Defendant's security failures enabled the hackers to steal the Private Information of Plaintiff and other members of the class—defined below. These failures put Plaintiff and other Class members' Private Information at a serious, immediate, and ongoing risk. Additionally, Defendant's failures caused costs and expenses associated with the time spent and the loss of productivity from taking time to address and attempt to ameliorate the release of personal data, as well as emotional grief associated with constant monitoring of personal banking and credit accounts. Mitigating and dealing with the actual and future consequences of the Data Breach has also created a number of future consequences for Plaintiff and Class members—including, as appropriate, reviewing records of fraudulent charges for services billed but not received, purchasing credit monitoring and identity theft protection services, the imposition of withdrawal and purchase limits on compromised accounts, initiating and monitoring credit freezes, the loss of

---

[4] *Cargurus Data Breach via ShinyHunters*, CAPTAIN COMPLIANCE (Feb. 23, 2026), https://captaincompliance.com/education/cargurus-data-breach-via-shinyhunters/.

property value of their personal information, and the stress, nuisance, and aggravation of dealing with all issues resulting from the Data Breach.

8. Plaintiff and Class members suffered a loss of the property value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of the loss of the property value of personal information in data breach cases.

9. There has been no assurance offered from CarGurus that all personal data or copies of data have been recovered or destroyed.

10. Accordingly, Plaintiff and the Class assert claims for negligence, breach of contract, breach of implied contract, and a claim for declaratory relief.

## PARTIES

### A. Plaintiff Nancy Infield

11. Plaintiff Nancy Infield is a citizen of Bradenton, Florida, and brings this action in her individual capacity and on behalf of all others similarly situated.

12. Plaintiff Infield is a user of the CarGurus platform. Plaintiff Infield has primarily used Defendant's services to browse and inquire about cars for sale on the Website. To create an account on the Website, which she has since deleted, Plaintiff Infield was required to disclose her PII, which was then entered into CarGurus' database and maintained by Defendant.

13. In maintaining Plaintiff Infield's Private Information, Defendant expressly and impliedly promised to safeguard this highly sensitive PII. Defendant, however, did not take proper care of Plaintiff Infield's PII, leading to its exposure as a direct result of Defendant's inadequate security measures.

14. Upon information and belief, CarGurus has not acknowledged the Data Breach,

either publicly or by notifying its consumers. Thus, Plaintiff Infield learned of the Breach by receiving notifications from a variety of data security websites, including DataBreach.com[5], HaveIBeenPwned.com[6], and OmniWatch.com.[7]

15. Following these notifications, Plaintiff Infield experienced the following: repeated login failures on various accounts in which she uses system-generated passwords stored securely in her iPhone; unexpected forced logouts from various accounts; increased phishing attempts targeting her email; and receiving "incorrect password" messages despite verifying that she was entering the correct credentials.

16. Immediately after receiving notification of the Breach from these data security websites, Plaintiff Infield has spent an appreciable amount of time evaluating her next steps, including researching the Breach, consulting with legal counsel, changing her passwords, and monitoring her financial accounts in an effort to mitigate the damage that has been caused by Defendant.

17. Plaintiff is very careful about sharing PII and has never knowingly transmitted unencrypted PII over the Internet or any other unsecured source.

18. The failure by CarGurus to notify its consumers and users of its Website of the Data Breach is unacceptable. Because CarGurus has failed to describe which specific information was involved in the Breach, who gained access to that information, or when that information was released to cybercriminals, Plaintiff Infield and Class members now face an increased risk of identify theft due not only to the Data Breach itself, but also because of Defendant's failure to provide any notice at all, forestalling Plaintiff Infield and Class members' efforts to protect

[5] *See* Exhibit 1.
[6] *See* Exhibit 2.
[7] *See* Exhibit 3.

themselves from further damage.

19. In the months and years following the Data Breach, Plaintiff Infield and the Class will continue to experience a slew of harms as a direct result of Defendant's ineffective data security measures. Some of these harms will include fraudulent charges, applications for financial services requested in Class members' names without their permission, spear phishing, credential stuffing, targeted advertising without consent, and more.

20. Plaintiff Infield has suffered, and will continue to suffer, actual injury and damages as a result of the Data Breach. Plaintiff Infield greatly values her privacy and would not have provided her information to CarGurus if she had known that her information would be maintained using inadequate data security systems.

21. Plaintiff Infield suffered actual injury in the form of damages and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant.

22. Plaintiff Infield suffered lost time, annoyance, interference, anxiety, and inconvenience as result of the Data Breach, as well as increased concerns for the loss of her privacy, especially her PII.

23. Plaintiff Infield reasonably believes that her PII may have already been sold by cybercriminals. Had she been notified of Defendant's Data Breach in a timely manner, she could have attempted to mitigate her injuries.

24. Plaintiff Infield has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her stolen PII being placed in the hands of unauthorized third parties and possibly criminals.

25. Plaintiff has a continuing interest in ensuring that her PII, which upon information and belief remains backed up and in Defendant's possession, is protected and safeguarded from

future breaches.

### B. Defendant CarGurus

26. Defendant is "the #1 most-visited digital auto platform in the United States" with 39.7 million monthly users, and over 24,000 U.S. car dealers served.[8]

27. Defendant is organized under the laws of Delaware. Its headquarters and principal place of business is located at 1001 Boylston Street, 16th Floor, Boston, Massachusetts 02115.

## JURISDICTION AND VENUE

### C. Jurisdiction

28. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and there are more than 100 members in the putative Class, and at least one member of the Class, such as Plaintiff, is a citizen of a state different from Defendant.

29. The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in Massachusetts; it is registered with the Massachusetts Secretary of State as a corporation; it maintains its headquarters and principal place of business in Massachusetts; and it committed tortious acts in Massachusetts.

### D. Venue

30. Venue is proper in this district under 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this district, because it is the district within which Defendant has the most significant contacts, and because a substantial portion of the acts and

[8] *About*, CARGURUS, https://www.cargurus.com/about/cargurus (last visited Feb. 24, 2026).

omissions that give rise to the claims herein occurred in this district.

## FACTS

31. Defendant is a digital auto platform serving customers across the United States.

32. As part of its business as an online automobile marketplace, Defendant collected, stored, and used Plaintiff's and Class members' Private Information. Defendant was entrusted with and obligated to safeguard and protect the Private Information of Plaintiff and the Class in accordance with all applicable laws.

33. Upon information and belief, the Data Breach occurred in February 2026. However, upon information and belief, as of the date of this Complaint, Defendant has failed to acknowledge the Breach, either publicly or through notifying its consumers.

34. This failure to notify affected consumers and users of the Website leaves Plaintiff and Class members in the dark as to the full details of the Data Breach, leaving them without the sufficient information and tools to mitigate the effects of the Breach. As a result, Plaintiff and Class members have suffered and will suffer harm they otherwise could have avoided had a timely disclosure been made.

35. Defendant has failed to provide basic details of the Data Breach, including but not limited to, how unauthorized parties accessed its networks, what information was accessed, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the Breach occurred system-wide, whether servers storing information were accessed, and how many consumers and Website Users were affected by the Data Breach.

36. Given the nature of the Data Breach, Plaintiff and Class members' PII is likely already, or will be imminently, for sale to criminals on the dark web, meaning that unauthorized parties have accessed and viewed Plaintiff and Class members' unencrypted, unredacted

information, including but not limited to full names, phone numbers, physical addresses, email addresses, and financial information.

37. The Breach occurred because Defendant failed to take reasonable measures to protect the PII it collected and stored. Among other things, Defendant failed to implement data security measures designed to prevent this attack, despite repeated warnings about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past.

38. Defendant disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff and Class members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class members was compromised through unauthorized access by an unknown third party. Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe.

**A. Defendant's Privacy Promises**

39. CarGurus made, and continues to make, various promises to its customers, including Plaintiff and the Class, that it will maintain the security and privacy of their Private Information.

40. CarGurus advertises itself as being founded for the purpose of "bring[ing] more trust and transparency to car shopping."[9]

41. In its Privacy Notice, in direct contradiction to its failure to provide timely notice of the Data Breach, CarGurus states that it "believe[s] in being transparent with respect to the

[9] *About*, CARGURUS, https://www.cargurus.com/about/cargurus (last visited Feb. 24, 2026).

personal information that we process."[10]

42. CarGurus promises that it has "implemented administrative, technical, personnel, and physical security measures designed to protect the personal information stored in our systems against loss, theft and unauthorized use, disclosure or modification" and that it "employ[s] processes (such as password hashing, login auditing, and idle session termination, as appropriate) designed to protect against unauthorized access to your personal information."[11]

43. In its Privacy Notice, CarGurus describes how it may use and disclose Private Information, none of which provide a right to expose consumers' Private Information to cybercriminals.

44. By failing to protect Plaintiff and Class members' Private Information, and by allowing the Data Breach to occur, CarGurus broke these promises to Plaintiff and Class members.

**B. The Data Breach was a Foreseeable Risk for which Defendant was on Notice.**

45. It is well known that PII, particularly Social Security numbers, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Defendant, are well aware of the risk of being targeted by cybercriminals.

46. Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, including severe distress and hours of lost time trying to fight against the impact of identity theft.

47. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research

[10] *CarGurus' Privacy Notice*, CARGURUS, https://www.cargurus.com/about/privacy-policy#Subsection-III (last visited Feb. 24, 2026).
[11] *Id*.

study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[12]

48. Individuals, like Plaintiff and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and are likened to accessing your DNA for hacker's purposes. Without any notification or information from Defendant about the Breach, Plaintiff and Class members remain concerned that their Social Security numbers have been accessed by cybercriminals.

49. Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse.

50. The Social Security Administration has warned that obtaining a new Social Security number will not alleviate all risks of identity theft. This is because:

> [O]ther governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[13]

51. In 2024, there were 3,158 data breaches recorded, similar to the 3,205 breaches

---

[12] Erika Harrell, *Victims of Identity Theft*, 2018, U.S. DEP'T OF JUSTICE BULLETIN at 9 (Apr. 2021), https://bjs.ojp.gov/document/vit18.pdf.

[13] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. PUB. NO. 05-10064 at 6 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

reported in 2023. However, the number of victims affected jumped to 1.35 billion people, a 211% increase from 2023 to 2024.[14]

52. In light of high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that its computer network would be targeted by cybercriminals.

53. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, prepared for, and hopefully can ward off a cyberattack. According to an FBI publication, "[r]ansomware is a type of malicious software—or malware—that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[15] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[16]

54. Despite the prevalence of public announcements of data breach and data security compromises and its own acknowledgment of its duties to keep PII private and secure, Defendant

---

[14] *Identity Theft Resource Center's 2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, IDENTITY THEFT RESOURCE CENTER (Jan. 28, 2025), https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/.
[15] *Ransomware*, FEDERAL BUREAU OF INVESTIGATION, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware (last visited Oct. 6, 2025).
[16] *Id*.

failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being compromised.

**C. Defendant Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Plaintiff's and Class Members' Private Information**

55. CarGurus acquires, collects, and stores a massive amount of Private Information from its customers and users of its Website.

56. As a condition of creating an account with CarGurus, which is required to buy, sell, or request information for any vehicles on the Website, Defendant requires that consumers entrust them with highly confidential Private Information.

57. By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class members' Private Information, CarGurus assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff and Class members' Private Information from disclosure.

58. Defendant had obligations created by industry standards, common law, and its own Privacy Notice to keep Class members' Private Information confidential and to protect it from unauthorized access and disclosure.

59. Defendant failed to properly safeguard Plaintiff's and Class members' Private Information, allowing hackers to access their Private Information.

60. Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant and any of its affiliates would comply with their obligation to keep such information confidential and secure from unauthorized access.

61. Before, during, and after the Data Breach, Defendant promised its customers and Website users that their Private Information would be kept confidential.

62. Defendant's failure to provide adequate security measures to safeguard Plaintiff's and Class members' Private Information is especially egregious because Defendant was aware that online marketplaces storing sensitive Private Information have been frequent targets of scammers attempting to fraudulently gain access to highly confidential Private Information belonging to customers.

63. In fact, Defendant has been on notice for years that companies that store sensitive Private Information are a prime target for scammers because of the amount of confidential information maintained.

**D. At All Relevant Times, Defendant Had a Duty to Plaintiff and Class Members to Properly Secure Their Private Information**

64. At all relevant times, Defendant had a duty to Plaintiff and Class members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class members, and to promptly notify Plaintiff and Class members when Defendant became aware that their PII was compromised.

65. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiff and Class members.

66. Security standards commonly accepted among businesses that store PII using the Internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c. Monitoring for suspicious or irregular traffic to servers;

d. Monitoring for suspicious credentials used to access servers;

e. Monitoring for suspicious or irregular activity by known users;

f. Monitoring for suspicious or unknown users;

g. Monitoring for suspicious or irregular server requests;

h. Monitoring for server requests for PHI;

i. Monitoring for server requests from VPNs; and

j. Monitoring for server requests from Tor Exit Nodes.

67. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

68. The ramifications of Defendant's failure to keep consumers' PII secure are long-lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiff and the Class may continue for years.

**E. The Value of Personally Identifiable Information**

69. The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay for it through the dark web. Numerous sources cite dark web pricing for

[17] 17 C.F.R. § 248.201(b)(9).
[18] 17 C.F.R. § 248.201(b)(9).

stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[19]

70. Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[20]

71. Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> Scammers use your Social Security number (SSN) to get other personal information about you. They can use your SSN and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your SSN until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.[21]

72. Attempting to change or cancel a stolen Social Security number is difficult, if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

73. Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad

---

[19] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.
[20] *In the Dark*, VPN OVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 6, 2025).
[21] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. PUB. NO. 05-10064 at 1 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

information is quickly inherited into the new Social Security number."[22]

74. This data, as one would expect, demands a much higher price on the black market. Martin Walter, Senior Director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[23]

75. PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[24]

76. Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class members' PII can easily obtain Class members' tax returns or open fraudulent credit card accounts in Class members' names.

77. The Private Information believed to have been compromised in this Data Breach is static and difficult, if not impossible, to change.

78. Moreover, upon information and belief, Defendant has not offered those affected any complimentary credit monitoring and identity restoration services. Defendant's failure to provide this option to Plaintiff and Class members is inadequate when victims are likely to face

---

[22] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[23] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[24] Memorandum from Clay Johnson III, Deputy Director for Management, Office of Management and Budget, on Safeguarding Against and Responding to the Breach of Personally Identifiable Information, n.1 (May 22, 2007), *available at* https://whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2007/m07-16.pdf.

many years of identity theft.

79. The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

80. Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the cyberattack into its systems and, ultimately, the theft of Plaintiff and Class members' Private Information.

**F. Defendant Failed to Comply with Federal Trade Commission ("FTC") Guidelines**

81. Federal and state governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[25]

82. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[26] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

[25] *Start With Security: A Guide for Business*, FED. TRADE. COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[26] *Protecting Personal Information: A Guide for Business*, FED. TRADE. COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.

83. The FTC emphasizes that early notification to data breach victims reduces injuries, stating that "[i]f you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused" and "thieves who have stolen names and Social Security numbers can use that information not only to sign up for new accounts in the victim's name, but also to commit tax identity theft. People who are notified early can take steps to limit the damage."[27]

84. The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[28]

85. The FTC makes the following recommendations to businesses[29]:

a. Identify all connections to the computers where they store sensitive information.

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c. Do not store sensitive consumer data on any computer with an Internet connection unless it is essential for conducting their business.

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an Internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them.

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the Internet.

---

[27] *Data Breach Response: A Guide for Business*, FED. TRADE. COMM'N (Aug. 2023), https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business (last visited Oct. 6, 2025).
[28] *Start with Security*, *supra* note 25.
[29] *Protecting Personal Information, supra* note 26.

g. Determine whether a border firewall should be installed where the business' network connects to the Internet. A border firewall separates the network from the Internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

86. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

87. Because Plaintiff and Class members entrusted Defendant with their PII, Defendant had, and has, a duty to Plaintiff and the Class to keep their PII secure.

88. Plaintiff and Class members reasonably expected that when they provided PII to Defendant, Defendant would safeguard their PII.

89. Defendant was at all times fully aware of its obligation to protect the personal and financial data of employees and clients, including Plaintiff and members of the Class. Defendant was also aware of the significant repercussions if it failed to do so.

90. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**G. Defendant's Inadequate Security Resulted in Concrete Injuries**

91. Plaintiff and Class members reasonably expected that Defendant would provide adequate security protections for their PII, and Class members provided Defendant with sensitive personal information, including their names, driver's license numbers, highly sensitive medical information, and Social Security numbers.

92. Defendant's poor data security deprived Plaintiff and Class members of the benefit of their bargain. Plaintiff and other individuals whose PII was entrusted with Defendant understood and expected that, as part of that business relationship, they would receive data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiff and Class members received data security that was of a lesser value than what they reasonably expected. As such, Plaintiff and the Class members suffered pecuniary injury.

93. Cybercriminals intentionally attack and exfiltrate PII to exploit it. Thus, Plaintiff and Class members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft. Plaintiff and Class members have also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

94. The cybercriminals who obtained Plaintiff and Class members' PII may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web." Having obtained these names, driver's license numbers, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud

in a Class member's name, including but not limited to:

a. Obtaining employment;

b. Obtaining a loan;

c. Applying for credit cards or spending money;

d. Filing false tax returns;

e. Stealing Social Security and other government benefits; and

f. Applying for a driver's license, birth certificate, or other public document.

95. In addition, if a Class member's Social Security number is used to create false identification for someone who commits a crime, the Class member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

96. As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and the other Class members have been deprived of the value of their PII, for which there is a well-established national and international market.

97. Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for fraudulent misuse of this information to be detected.

98. Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the other Class members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class members' PII will do so at a later date or re-sell it.

99. As a result of the Data Breach, Plaintiff and Class members have already suffered

injuries, and each are at risk of a substantial and imminent risk of future identity theft.

**H. Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft**

100. Data breaches, such as the one experienced by Plaintiff and the Class, are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

101. In 2019, the U.S. Government Accountability Office released a report addressing the steps consumers can take after a data breach.[30] Its appendix of steps consumers should consider, in simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options.[31] It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and the Class) must take after a breach like Defendant's are both time-consuming and of only limited and short-term effectiveness.

102. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[32]

103. It must also be noted that there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information

---

[30] *Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services*, U.S. GOV'T ACCOUNTABILITY OFFICE, REPORT NO. GAO-19-230 (Mar. 2019) at 37-41, *available at* https://www.gao.gov/assets/gao-19-230.pdf (last visited Oct. 6, 2025).
[31] *Id*.
[32] *Identity Theft*, FEDERAL TRADE COMMISSION, https://consumer.ftc.gov/identity-theft-and-online-security/identity-theft (last visited Oct. 6, 2025).

and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

104. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

105. There is a strong probability that the entirety of the stolen information has been dumped on the dark web or will be dumped on the dark web, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class members must vigilantly monitor their financial and medical accounts for many years to come.

106. As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[34]

## **CLASS ACTION ALLEGATIONS**

107. Plaintiff brings this action on behalf of herself and on behalf of all other persons

---

[33] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, U.S. GOV'T ACCOUNTABILITY OFFICE, REPORT NO. GAO-07-737 (June 2007) at 29, *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 6, 2025).

[34] *A Cost Analysis of Healthcare Sector Data Breaches*, DEPARTMENT OF HEALTH & HUMAN SERVICES (Apr. 12, 2019), at 2, *available at* https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf (last visited Oct. 6, 2025).

similarly situated ("the Class").

108. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All individuals whose Private Information was compromised through the breach of Defendant's computer network in or around February 2026.

109. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

110. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

111. **Numerosity**. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, based on information and belief, the Class consists of approximately thousands of people whose data was compromised in Data Breach.

112. **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data

Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class members to safeguard their Private Information;

g. Whether computer hackers obtained Class members' Private Information in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's conduct was negligent;

k. Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

l. Whether Plaintiff and Class members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

113. **Typicality**. Plaintiff's claims are typical of those of other Class members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach.

114. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

115. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class members, in that all the Plaintiff's and Class members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important

and desirable advantages of judicial economy.

116. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

117. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class wide basis.

118. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendant failed to take commercially reasonable steps to

safeguard consumer Private Information;

e. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

119. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiff and the Class)**

120. Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

121. Upon Defendant's accepting and storing the Private Information of Plaintiff and the Class in its computer systems and on its networks, Defendant undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendant knew that the Private Information was private and confidential and should be protected as such.

122. Defendant owed a duty of care not to subject Plaintiff and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

123. Defendant owed numerous duties to Plaintiff and the Class, including the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in their possession;

b. To protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices;

c. To implement processes to quickly detect a data breach; and

d. To timely act on warnings about a data breach.

124. Defendant also breached its duty to Plaintiff and Class members to adequately protect and safeguard Private Information, and to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse. This permitted a malicious third party to gather Plaintiff and Class members' Private Information, as well as misuse the Private Information and intentionally disclose it to others without consent.

125. Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches involving online marketplaces similar to its Website.

126. Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff and Class members' Private Information.

127. Defendant breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and Class members' Private Information.

128. Because Defendant knew that a breach of its systems would damage tens of thousands of its consumers and users of its Website, including Plaintiff and Class members, Defendant had a duty to adequately protect its data systems and the Private Information contained thereon.

129. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its consumers, which is recognized by

laws and regulations including but not limited to common law. Defendant was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

130. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

131. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

132. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information, and by failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

b. Failing to adequately monitor the security of Defendant's networks and systems;

c. Allowing unauthorized access to Class members' Private Information; and

d. Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

133. Through Defendant's acts and omissions described in this Complaint, Defendant breached its duty to use reasonable care to adequately protect and secure Plaintiff and Class members' Private Information during the time it was within Defendant's possession or control.

134. Defendant's conduct was grossly negligent and departed from all reasonable standards of care.

135. Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

136. As a direct and proximate cause of Defendant's conduct, Plaintiff and Class members suffered damages as alleged above.

137. Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class members.

**COUNT II**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

138. Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

139. Plaintiff and Class members entered valid and enforceable express contracts with Defendant under which Plaintiff and Class members agreed to provide their Private Information to Defendant, and Defendant agreed to provide services and, impliedly, if not explicitly, agreed to protect Plaintiff and Class members' Private Information.

140. These contracts include Defendant's Privacy Notice mentioned above.

141. To the extent Defendant's obligation to protect Plaintiff and other Class members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendant to implement data security adequate to safeguard and protect the confidentiality of Plaintiff and other Class members' Private Information, including in accordance with federal, state and local laws, and industry standards.

142. Plaintiff and Class members would not have entered into these contracts with Defendant without the understanding that Plaintiff and other Class members' Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

143. A meeting of the minds occurred, as Plaintiff and other Class members agreed, among other things, to provide their Private Information in exchange for Defendant's agreement to protect the confidentiality of that Private Information.

144. The protection of Plaintiff and Class members' Private Information was a material aspect of Plaintiff and Class members' contracts with Defendant.

145. Defendant's promises and representations described above relating to industry practices, and about Defendant' purported concern about their consumers' privacy rights, became terms of the contracts between Defendant and its clients, including Plaintiff and Class members. Defendant breached these promises by failing to comply with reasonable industry practices.

146. Plaintiff and Class members read, reviewed, and/or relied on statements made by or provided by Defendant and/or otherwise understood that Defendant would protect its consumers' and users' Private Information if that information were provided to Defendant.

147. Plaintiff and Class members fully performed their obligations under the implied contract with Defendant. Defendant did not.

148. As a result of Defendant's breach of these terms, Plaintiff and other Class members have suffered a variety of damages including but not limited to:

a. The value of lost privacy;

b. Failing to receive the benefit of their bargain with Defendant;

c. The difference in the value of the services Defendant promised and the services they received;

d. The value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, closely reviewing and monitoring credit reports and various accounts for unauthorized activity, and filing police reports; and

e. Being placed at an increased risk of future identity theft, fraud, and/or misuse of their Private Information, which may take years to manifest, discover, and detect.

149. Plaintiff and Class members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## **COUNT III**
## **Breach of Implied Contract**
## **(On Behalf of Plaintiff and the Class, in the Alternative to Count II)**

150. Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

151. Through their course of conduct, Defendant, Plaintiff, and Class members entered into implied contracts for the provision of services, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff and Class members' Private Information.

152. Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendant when she first entered into the services agreement with Defendant.

153. The valid and enforceable implied contracts that Plaintiff and Class members entered into with Defendant include Defendant's promise to protect nonpublic Private Information given to Defendant from disclosure.

154. When Plaintiff and Class members provided their Private Information to Defendant in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

155. Defendant solicited and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class members accepted Defendant's offers and provided their Private Information to Defendant.

156. In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

157. Class members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

158. Under implied contracts, Defendant and/or its affiliated providers promised and were obligated to: (a) provide services to Plaintiff and Class members; and (b) protect Plaintiff and the Class members' Private Information provided to obtain such benefits of such services. In exchange, Plaintiff and Class members agreed to pay money for these services and to turn over their Private Information.

159. Both the provision of CarGurus' services and the protection of Plaintiff and Class members' Private Information were material aspects of these implied contracts.

160. The implied contracts for the provision of services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including, among other documents, Defendant's Privacy Notice.

161. Defendant's express representations, including, but not limited to the express representations found in its Website, memorialize and embody the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of

Plaintiff and Class members' Private Information.

162. Consumers value their privacy and the privacy of their dependents. Plaintiff and Class members would not have entrusted their Private Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected. Nor would they have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

163. A meeting of the minds occurred, as Plaintiff and Class members agreed and provided their Private Information to Defendant and/or its affiliated entities in exchange for, amongst other things, the protection of their Private Information.

164. Plaintiff and Class members performed their obligations under the contract when they provided their Private Information and, in some cases, paid for Defendant's services.

165. Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant gathered when the information was accessed and exfiltrated through the Data Breach.

166. Defendant materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Privacy Notice. Defendant did not maintain the privacy of Plaintiff and Class members' Private Information as evidenced by the fact that the Data Breach took place. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA or otherwise protect Plaintiff and Class members' Private Information as set forth above.

167. The Data Breach was a reasonably foreseeable consequence of Defendant's action and/or inaction in breach of these contracts.

168. As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class members did not receive full benefit of the bargain, and instead received services that were of a diminished value to that described in the contracts. Plaintiff and Class members therefore were damaged in an amount at least equal to the difference in the value of the services they paid for and the services they received.

169. Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, Class members, nor any reasonable person would have used Defendant's.

170. As a direct and proximate result of the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

171. Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

172. Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**COUNT IV**
**Declaratory Relief**
**(On Behalf of Plaintiff and the Class)**

173. Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

174. Under Mass. Gen. Laws ch. 231A, § 1, *et seq*., this Court is authorized to enter a

judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

175. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff and Class members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their PII will occur in the future.

176. The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect student and employee PII.

177. Defendant still possesses the PII of Plaintiff and the Class.

178. Defendant has made no announcement that it has changed its data storage or security practices relating to the PII.

179. Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

180. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at CarGurus. The risk of another such breach is real, immediate, and substantial.

181. The hardship to Plaintiff and Class members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Among other things, if yet another data breach occurs at CarGurus, Plaintiff and Class members will likely continue to be subjected to fraud,

identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

182. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at CarGurus, thus eliminating the additional injuries that would result to Plaintiff and Class members, along with other consumers whose PII would be further compromised.

183. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that CarGurus owed and continues to owe a duty to implement and maintain reasonable security measures, including but not limited to the following:

a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on CarGurus' systems on a periodic basis, and ordering CarGurus to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

e. Conducting regular database scans and security checks; and

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and

against Defendant, as follows:

A. For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and Class members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

C. For declaratory relief concluding that CarGurus owed, and continues to owe, a legal duty to employ reasonable data security to secure the Private Information with which it is entrusted, specifically including information pertaining to Private Information it obtains from its consumers, and to notify impacted individuals of the Breach under the common law and Section 5 of the FTC Act;

D. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to student and employee data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

E. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

F. Ordering Defendant to pay for not less than three (3) years of credit monitoring services for Plaintiff and the Class;

G. For an award of actual damages, compensatory damages, statutory damages, treble damages, and statutory penalties, in an amount to be determined, as allowable by law;

H. For an award of punitive damages, as allowable by law;

I. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J. Pre- and post-judgment interest on any amounts awarded; and

K. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Date: February 26, 2026

Respectfully submitted,

*/s/ Richard E. Levine*
Richard E. Levine, Esq.
BBO No. 672675
*rlevine@stanzlerlevine.com*
**Stanzler Levine, LLC**
37 Walnut Street, Suite 200
Wellesley, MA 02481
Tel: (617) 482-3198 Ext. 101

*/s/ Jason S. Rathod*
Jason S. Rathod, Esq.*
*jrathod@classlawdc.com*
Nicholas A. Migliaccio, Esq.*
*nmigliaccio@classlawdc.com*
**Migliaccio & Rathod LLP**
412 H Street NE
Washington, DC 20002
Tel: (202) 470-3520
Fax: (202) 800-2730

**pro hac vice anticipated*

*Counsel for Plaintiff*