**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re CarGurus Data Security Litigation*<br>This Document Relates to:<br>ALL ACTIONS | Case No. 1:26-cv-10996-MJJ<br>**DEMAND FOR JURY TRIAL** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Michael Allen, Christopher Arden, Ted Campbell, Roozbeh Hamed-Zanjani, Latonya Holliday, Brandon Louis, David Ramirez, Scott Weiscope, and Chad Williams (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant CarGurus, Inc. ("CarGurus" or "Defendant") and allege, upon personal knowledge as to their own actions, and upon their counsel's investigation and information and belief as to all other matters, as follows:

## INTRODUCTION

1. Plaintiffs, for themselves and others similarly situated, seek monetary damages and injunctive and declaratory relief arising from Defendant's failure to safeguard its customers' email addresses, IP addresses, full names, phone numbers, physical addresses, user account IDs, finance pre-qualification application data (including Social Security numbers), finance application outcomes, dealer account details, and subscription information (collectively, "Private Information"), which was stolen in a massive and preventable breach of Defendant's computer network that occurred in February 2026 (the "Data Breach").[1]

[1] Kurt Knutsson, *CarGurus breach linked to ShinyHunters exposes 12.4M records*, FOX NEWS (Mar. 15, 2026, 4:00 PM EDT), https://www.foxnews.com/tech/cargurus-breach-linked-shinyhunters-exposes-12-4m-records.

2. On February 21, 2026, notorious cybercriminal group ShinyHunters published a 6.1GB file believed to contain 12.4 million user records from CarGurus' information technology network.[2]

3. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its customers on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information.

4. In short, Defendant's failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

5. Upon information and belief, Defendant has yet to begin notifying Class Members about the Data Breach, despite becoming aware of the Data Breach more than three months ago.

6. This delayed notice is causing further harm to the Class Members, many of whom are likely unaware that their Private Information has been taken by cybercriminals and will be subject to imminent and ongoing fraudulent misuse.

7. Defendant has released a public statement to its dealership partners, letting them know that "sensitive data" was impacted. Defendant notified dealership partners if sensitive information regarding dealership employees was impacted.[3]

8. Plaintiffs are customers of Defendant and victims of the Data Breach. They bring this class action on behalf of themselves and all others harmed by Defendant's misconduct, as alleged herein.

9. The exposure of a person's Private Information to cybercriminals is a bell that cannot be unrung. Before this data breach, Defendant's current and former customers' Private

---

[2] *Id.*

[3] *Cybersecurity Incident Litigation*, CarGurus (May 1, 2026), https://dealers.cargurus.com/blog/cybersecurity-incident-information.

Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed.

## PARTIES

10. Plaintiff Michael Allen is a natural person and citizen of Myrtle, Mississippi. He is domiciled in Mississippi, where he intends to remain.

11. Plaintiff Christopher Arden is a natural person and citizen of Oceanside, California. He is domiciled in California, where he intends to remain.

12. Plaintiff Ted Campbell is a natural person and citizen of Richmond, Virginia. He is domiciled in Virginia, where he intends to remain.

13. Plaintiff Roozbeh Hamed-Zanjani is a natural person and citizen of Tempe, Arizona. He is domiciled in Arizona, where he intends to remain.

14. Plaintiff Latonya Holliday is a natural person and citizen of Atlanta, Georgia. She is domiciled in Georgia, where she intends to remain.

15. Plaintiff Brandon Louis is a natural person and citizen of Plainfield, Illinois. He is domiciled in Illinois, where he intends to remain.

16. Plaintiff David Ramirez is a natural person and citizen of Canyon Country, California. He is domiciled in California, where he intends to remain.

17. Plaintiff Scott Weiscope is a natural person and citizen of Mattoon, Illinois. He is domiciled in Illinois, where he intends to remain.

18. Plaintiff Chad Williams is a natural person and citizen of Gloucester, Massachusetts. He is domiciled in Massachusetts, where he intends to remain.

19. Defendant CarGurus, Inc. is a Delaware corporation with its principal place of business located at 1001 Boylston St., 16th Floor, Boston, MA 02115.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members. All Plaintiffs, except Plaintiff Williams, are citizens of a state different than Defendant.

21. This Court has general personal jurisdiction over Defendant CarGurus, Inc. because Defendant maintains its principal place of business in this District.

22. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

***CarGurus, Inc.***

23. CarGurus is a publicly traded automotive research and shopping company that operates in the U.S., Canada, and the U.K.[4] Its website has an estimated 40 million monthly visitors and helps people find, compare, and contact sellers of new and used vehicles.[5]

24. On information and belief, CarGurus failed to undertake adequate measures to safeguard the Private Information of Plaintiffs and the proposed Class Members, including failing to implement industry standards for data security, and failing to properly train customers on cybersecurity protocols, resulting in the Data Breach.

---

[4] *About*, CARGURUS, https://www.cargurus.com/about/cargurus (last visited May 22, 2026).
[5] *Id.*

25. In collecting and maintaining the Private Information, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. Plaintiffs reasonably expected as much as they took reasonable steps to secure their own Private Information.

26. Under state and federal law, businesses like Defendant have duties to protect their current and former customers' Private Information and to notify them about breaches.

27. Defendant recognizes these duties, promising in its Privacy Policy that:

> We have implemented administrative, technical, personnel, and physical security measures designed to protect the personal information stored in our systems against loss, theft and unauthorized use, disclosure or modification. We also employ processes (such as password hashing, login auditing, and idle session termination, as appropriate) designed to protect against unauthorized access to your personal information.[6]

28. Defendant also made an extensive list of promises about its security measures on its website:

[6] *Privacy Policy*, CARGURUS, https://www.cargurus.com/about/privacy-policy#Subsection-VIII (last visited Feb. 26, 2026).

**Here are our practices.**

We employ rigorous security measures at organizational, architectural, and operational levels to protect our applications, our infrastructure, and the data of our customers and website visitors. At CarGurus, we actively promote security awareness, provide training on data protection, and implement best practices, so that security principles and data privacy are top of mind for our employees. CarGurus considers information security principles when designing our platform, managing our networks, and conducting our daily business operations.

**Governance**
CarGurus has implemented formal data privacy, information security, and acceptable use policies that govern employee activities. We train our employees on these policies during onboarding and regularly thereafter. In addition, we rely on our Information Security and IT teams to enforce policies through the implementation of technical controls.

**Risk Management**
CarGurus performs regular information security risk assessments covering our facilities, systems, and information assets. We share risk assessment results and risk mitigation suggestions with senior management, as appropriate. Our risk assessment results specify proposed changes to systems, processes, policies, and tools to reduce security vulnerabilities and threats to CarGurus, its customers, and its website visitors. We mitigate risks through the implementation of policies, procedures, and controls.

**Vendor Security Management**
CarGurus conducts and records vendor security assessments for its service providers. Vendors are approved or rejected based on their relative security posture and the risk they would introduce for CarGurus.

**Security Operations**
CarGurus employs state-of-the-art endpoint security protections, intrusion detection systems, and advanced email protections to monitor our systems and prevent potential security incidents. CarGurus uses a next-generation anti-malware solution to address malicious software and other threats. Anti-malware agents are centrally managed and are configured to install updates on a regular basis. These agents alert operations analysts when malware is detected so they can take action.

CarGurus uses a vulnerability management program to identify and remediate vulnerabilities across our networks, reducing exposure, and minimize our attack surface. We also conduct 24/7 monitoring of our critical systems.

**Access Control**

CarGurus uses identity and access management controls to provide access to our systems through user accounts with appropriate privileges. CarGurus provisions all critical network and application access using the principle of least privilege. We limit key administrative access to authorized personnel. Provisioning and deprovisioning procedures exist to document the relevant access levels and approvals granted to critical systems and data. We conduct periodic access reviews for critical systems and applications, using a risk-based approach.

CarGurus uses an identity management single sign-on platform provider for our critical business applications. We assign users unique IDs and enforce password requirements that align, at a minimum, to NIST standards. Our identity management platform enforces CarGurus' password policy and requires multifactor authentication.

**Physical Security**

The CarGurus platform is hosted in the cloud and in state-of-the-art data centers. The co-located data centers provide physical and environmental security controls (including biometric identification, supervised entry, 24/7/365 on-premise security teams, and CCTV systems). Access to data centers is restricted to authorized individuals. Our data center facilities maintain SOC 2 reports, which describe and test the internal controls of the service organization.

**Data Privacy and Protection**

CarGurus takes the protection of personal data seriously. Databases are gated by role-based access controls, and multi-factor authentication is enforced on login. CarGurus employs recognized encryption protocols for data in transit and at rest.

CarGurus recognizes and adheres to data privacy laws and regulations, including the EU's General Data Protection Regulation (GDPR), California's Consumer Privacy Act (CCPA), and the PCI Data Security Standard. The GDPR and CCPA impose obligations regarding the collecting, processing, and transmission of personal data. CarGurus has implemented controls across our organization so that we can better achieve and maintain compliance with these frameworks. For more information about our data privacy practices, please visit CarGurus' Privacy Policy

29. As the self-proclaimed "#1 most-visited digital auto platform in the United States," Defendant knew that its customers would view its privacy policy and would expect Defendant to adhere to the policy.

30. As a direct and proximate result of Defendant's failures to protect Plaintiffs' and the Class Members' sensitive personal information and warn them promptly and fully about the

Data Breach, Plaintiffs and the proposed Class have suffered widespread injury and damages, necessitating Plaintiffs seeking relief on a class wide basis.

***Plaintiffs and the Class Members entrusted their Private Information to CarGurus***

31. Plaintiffs and the Class are current and former customers or employees of CarGurus or of CarGurus' dealership partners.

32. As a condition of receiving services and/or employment with CarGurus, Plaintiffs and the Class Members were required to provide their sensitive and confidential Private Information to CarGurus, either directly or indirectly.

33. CarGurus maintains records of Plaintiffs' and Class Members' Private Information in the ordinary course of business. These records are stored on CarGurus's network systems.

34. By obtaining, collecting, using, and deriving a benefit from the Private Information, CarGurus assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their Private Information from unauthorized disclosure.

35. Plaintiffs have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs, as customers, relied on CarGurus to keep their Private Information confidential and securely maintained, to use this information for authorized purposes and disclosures only.

36. Plaintiffs and the proposed Class Members entrusted their Private Information to CarGurus solely for the purposes of receiving services and/or employment, with the expectation and implied mutual understanding that CarGurus would strictly maintain the confidentiality of the information and undertake adequate measures to safeguard it from theft or misuse.

37. Plaintiffs and the proposed Class Members would not have entrusted CarGurus with their highly sensitive Private Information if they had known that CarGurus would fail to take

adequate measures to protect the information from unauthorized use or disclosure.

***Plaintiffs' and the Class Members' Private Information was Improperly Disclosed and Compromised in the Data Breach***

38. As a prerequisite to receiving services and/or employment with CarGurus, Plaintiffs and the Class Members disclosed their non-public and sensitive Private Information to CarGurus, with the implicit understanding that their Private Information would be kept confidential. This understanding was based on all the facts and circumstances attendant to receiving services, and the express, specific, written representations made by CarGurus and its agents.

39. Plaintiffs and the Class Members reasonably relied upon CarGurus's representations to their detriment and would not have provided their sensitive Private Information to CarGurus if not for CarGurus's explicit and implicit promises to adequately safeguard that information.

40. On February 18, 2026, ShinyHunters revealed in a post on its Dark Web leak site that over 1.7 million records containing Private Information and other internal corporate data were compromised in the Data Breach.[7]

[7] Dominic Alvieri (@AlvieriD), X (Feb. 17, 2026, 6:54 PM), https://x.com/AlvieriD/status/2023924107025211646/photo/1.




41. This post served as a "final warning" to CarGurus, as ShinyHunters threatened to publicly leak the stolen data by February 20, 2026, if Defendant did not contact them.[8]

42. ShinyHunters followed through with its threat on February 21, 2026, when it published a 6.1GB archive containing 12.4 million records stolen from CarGurus, with a link to download the data.[9]

---

[8] Bill Toulas, *CarGurus data breach exposes information of 12.4 million accounts*, BLEEPINGCOMPUTER (Feb. 24, 2026, 1:08 PM), https://www.bleepingcomputer.com/news/security/cargurus-data-breach-exposes-information-of-124-million-accounts/.

[9] *Id.;* Kurt Knutsson, *CarGurus breach linked to ShinyHunters exposes 12.4M records*, FOX NEWS (Mar. 15, 2026, 4:00 PM EDT), https://www.foxnews.com/tech/cargurus-breach-linked-shinyhunters-exposes-12-4m-records..




43. Upon information and belief, the stolen data included, but was not limited to, customers' and employees' email addresses, IP addresses, full names, phone numbers, physical addresses, user account IDs, finance pre-qualification application data (including Social Security numbers), finance application outcomes, dealer account details, and subscription information.[10]

44. ShinyHunters is "one of the most prolific data theft groups operating today" and it focuses on "exfiltration valuable customer and corporate data, which is then monetized through ransom demands or underground sales."[11]

45. Ransomware groups can monetize stolen Private Information and sell it on the dark

---

[10] Kurt Knutsson, *CarGurus breach linked to ShinyHunters exposes 12.4M records*, FOX NEWS (Mar. 15, 2026, 4:00 PM EDT), https://www.foxnews.com/tech/cargurus-breach-linked-shinyhunters-exposes-12-4m-records.

[11] *ShinyHunters Cyber Attacks Explained: What IT and Security Leaders Need to Know*, DIGITALXRAID, https://www.digitalxraid.com/blog/shinyhunters-cyber-attacks-explained/ (last visited Feb. 21, 2026).

web as part of a full identity profile.[12] Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[13]

46. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[14]

47. As a result of this Data Breach, the Private Information of Plaintiffs and the proposed Class Members was unauthorizedly disclosed and compromised.

48. The Data Breach was preventable and a direct result of CarGurus's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect customers' Private Information.

49. Thus, on information and belief, Plaintiffs' and the Class's stolen Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiffs' Experiences and Injuries***

<u>Michael Allen</u>

50. Plaintiff Michael Allen filled out a prequalification form with Defendant when he was searching for vehicles.

---

[12] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (last visited Feb. 21, 2026).

[13] *Id.*

[14] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

51. Defendant obtained and maintained Plaintiff Allen's Private Information through the form.

52. Defendant maintained Plaintiff Allen's Private Information when Defendant's databases were breached. As a result, Plaintiff Allen was injured by Defendant's Data Breach.

53. Plaintiff Allen is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

54. Plaintiff Allen provided his Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Allen's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

55. Plaintiff Allen does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

56. Worryingly, Plaintiff Allen received an extortion email from the cybercriminal group "ShinyHunters" on or around April 1, 2026**.**

57. On information and belief, Plaintiff Allen's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

58. Through its Data Breach, Defendant compromised Plaintiff Allen's Private Information.

59. Plaintiff Allen has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

60. In the aftermath of the Data Breach, Plaintiff Allen suffered a spike in spam and scam emails, text messages, and phone calls. Plaintiff Allen primarily receives spam from people claiming to work for banks—he has gotten calls about a mortgage from "West Capital Lending," "Loan Depot," and "Lending Tree."

61. Plaintiff Allen fears for his personal financial security and worries about the information belonging to him that was exposed in the Data Breach.

62. Because of Defendant's Data Breach, Plaintiff Allen has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Allen's injuries are precisely the type of injuries that the law contemplates and addresses.

63. Plaintiff Allen suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

64. Plaintiff Allen suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

65. Plaintiff Allen suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Allen's Private Information right in the hands of criminals.

66. Because of the Data Breach, Plaintiff Allen anticipates spending considerable amounts of time and money to try to mitigate his injuries.

67. Today, Plaintiff Allen has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

<u>Christopher Arden</u>

68. Plaintiff Christopher Arden previously searched for a vehicle through Defendant and, in doing so, provided Defendant with his email address and telephone number.

69. Defendant Arden maintained Plaintiff's information, including his email address and telephone number, when Defendant's databases were breached.

70. As a result, Plaintiff Arden was injured by Defendant's Data Breach.

71. Plaintiff Arden is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

72. Plaintiff Arden provided his Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Arden's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

73. Worryingly, Plaintiff Arden received an extortion email from the cybercriminal group "ShinyHunters" after the Data Breach.

74. Plaintiff Arden has *already* suffered from identity theft and fraud—whereby AAA monitoring informed him that his information is on the dark web.

75. Thus, on information and belief, Plaintiff Arden's Private Information has already been published by cybercriminals on the dark web.

76. Through its Data Breach, Defendant compromised Plaintiff Arden's Private Information.

77. Plaintiff Arden has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

78. In the aftermath of the Data Breach, Plaintiff Arden suffered from a spike in spam and scam emails, text messages, and phone calls.

79. Plaintiff Arden fears for his personal financial security and worries about the information belonging to him that was exposed in the Data Breach.

80. Because of Defendant's Data Breach, Plaintiff Arden has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Arden's injuries are precisely the type of injuries that the law contemplates and addresses.

81. Plaintiff Arden suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

82. Plaintiff Arden suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

83. Plaintiff Arden suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Arden's Private Information right in the hands of criminals.

84. Because of the Data Breach, Plaintiff Arden anticipates spending considerable amounts of time and money to try to mitigate his injuries.

85. Today, Plaintiff Arden has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

Ted Campbell

86. Plaintiff Ted Campbell signed up for a preapproval to purchase a vehicle through Defendant.

87. Defendant obtained and maintained Plaintiff Campbell's Private Information through the information that Defendant sought in the preapproval process.

88. Defendant maintained Plaintiff Campbell's Private Information when Defendant's databases were breached.

89. As a result, Plaintiff Campbell was injured by Defendant's Data Breach.

90. Plaintiff Campbell is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

91. Plaintiff Campbell provided his Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Campbell's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

92. Plaintiff Campbell does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

93. Worryingly, Plaintiff Campbell received an email from Mastercard dated March 4, 2026, informing him that his information was breached and was on the dark web. Plaintiff Campbell subsequently received an email from Defendant dated March 5, 2026, informing him of the Data Breach.

94. Thus, on information and belief, Plaintiff Campbell's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

95. Through its Data Breach, Defendant compromised Plaintiff Campbell's Private Information.

96. Plaintiff Campbell has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

97. Plaintiff Campbell fears for his personal financial security and worries about the information belonging to him that was exposed in the Data Breach.

98. Because of Defendant's Data Breach, Plaintiff Campbell has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Campbell's injuries are precisely the type of injuries that the law contemplates and addresses.

99. Plaintiff Campbell suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

100. Plaintiff Campbell suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

101. Plaintiff Campbell suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Campbell's Private Information right in the hands of criminals.

102. Because of the Data Breach, Plaintiff Campbell anticipates spending considerable amounts of time and money to try to mitigate his injuries.

103. Today, Plaintiff Campbell has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

Roozbeh Hamed-Zanjani

104. Plaintiff Roozbeh Hamed-Zanjani browsed Defendant's website and, in doing so, was required to create an account that included his personal information.

105. Defendant obtained and maintained Plaintiff Hamed-Zanjani's Private Information by requiring Plaintiff Hamed-Zanjani to submit personal information during account creation. Defendant maintained Plaintiff Hamed-Zanjani's Private Information when Defendant's databases were breached.

106. As a result, Plaintiff Hamed-Zanjani was injured by Defendant's Data Breach.

107. Plaintiff Hamed-Zanjani is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

108. Plaintiff Hamed-Zanjani provided his Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Hamed-Zanjani's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

109. Plaintiff Hamed-Zanjani does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

110. Worryingly, Plaintiff Hamed-Zanjani received notifications from multiple dark web monitoring websites informing him that his information was detected on the dark web due to Defendant's Data Breach. Plaintiff Hamed-Zanjani also received an email from the cybercriminal group "ShinyHunters" dated April 4, 2026.

111. Plaintiff Hamed-Zanjani used the automated chat feature on Defendant's website to inquire whether Defendant had been involved in a data breach, and the chat feature responded, "I regret to inform you that this is indeed the case."

112. Thus, on information and belief, Plaintiff Hamed-Zanjani's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

113. Through its Data Breach, Defendant compromised Plaintiff Hamed-Zanjani's Private Information.

114. Plaintiff Hamed-Zanjani has *already* suffered from identity theft and fraud—whereby in March 2026, he had an unauthorized Uber charge on his credit card.

115. Plaintiff Hamed-Zanjani has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

116. In the aftermath of the Data Breach, Plaintiff Hamed-Zanjani suffered from a spike in spam and scam emails, text messages, and phone calls offering financial services, such as loans and lines of credit.

117. Plaintiff Hamed-Zanjani fears for his personal financial security and worries about the information belonging to him that was exposed in the Data Breach.

118. Because of Defendant's Data Breach, Plaintiff Hamed-Zanjani has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries

go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Hamed-Zanjani's injuries are precisely the type of injuries that the law contemplates and addresses.

119. Plaintiff Hamed-Zanjani suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

120. Plaintiff Hamed-Zanjani suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

121. Plaintiff Hamed-Zanjani suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Hamed-Zanjani's Private Information right in the hands of criminals.

122. Because of the Data Breach, Plaintiff Hamed-Zanjani anticipates spending considerable amounts of time and money to try to mitigate his injuries.

123. Today, Plaintiff Hamed-Zanjani has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

LaTonya Holliday

124. Plaintiff LaTonya Holliday created an account with Defendant on or around June 24, 2015, when searching for a vehicle.

125. Defendant obtained and maintained Plaintiff Holliday's Private Information by requiring Plaintiff Holliday to submit personal information while creating an account.

126. Defendant maintained Plaintiff Holliday's Private Information when Defendant's databases were breached. As a result, Plaintiff Holliday was injured by Defendant's Data Breach.

127. Plaintiff Holliday is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. She is careful to store any documents containing her Private Information in a secure location.

128. Plaintiff Holliday provided her Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Holliday's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

129. Worryingly, Plaintiff Holliday received extortion emails from the cybercriminal group "ShinyHunters" on or around April 4, 2026 and May 19, 2026..

130. Thus, on information and belief, Plaintiff Holliday's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

131. Through its Data Breach, Defendant compromised Plaintiff Holliday's Private Information.

132. Plaintiff Holliday has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

133. In the aftermath of the Data Breach, Plaintiff Holliday suffered from a spike in spam and scam emails.

134. Plaintiff Holliday fears for her personal financial security and worries about the information belonging to her that was exposed in the Data Breach.

135. Because of Defendant's Data Breach, Plaintiff Holliday has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far

beyond allegations of mere worry or inconvenience. Rather, Plaintiff Holliday's injuries are precisely the type of injuries that the law contemplates and addresses.

136. Plaintiff Holliday suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

137. Plaintiff Holliday suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

138. Plaintiff Holliday suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Holliday's Private Information right in the hands of criminals.

139. Because of the Data Breach, Plaintiff Holliday anticipates spending considerable amounts of time and money to try to mitigate her injuries.

140. Today, Plaintiff Holliday has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

Brandon Louis

141. Plaintiff Brandon Louis, in connection with searching for a vehicle for his wife, submitted information during Defendant's prequalification process.

142. Thus, Defendant obtained and maintained Plaintiff's Private Information.

143. Defendant maintained Plaintiff Louis's Private Information when Defendant's databases were breached. As a result, Plaintiff Louis was injured by Defendant's Data Breach.

144. Plaintiff Louis is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe

manner. He is careful to store any documents containing his Private Information in a secure location.

145. Plaintiff Louis provided his Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Louis's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

146. Plaintiff Louis does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

147. Worryingly, Plaintiff Louis received an Experian alert stating that his Private Information was on the dark web around the time after the Data Breach.

148. Plaintiff Louis also received extortion emails from the cybercriminal group "ShinyHunters" on or about April 4, 2026 and May 19, 2026.

149. Thus, on information and belief, Plaintiff Louis's Private Information has already been published by cybercriminals on the dark web.

150. Through its Data Breach, Defendant compromised Plaintiff Louis's Private Information.

151. Plaintiff Louis has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

152. In the aftermath of the Data Breach, Plaintiff Louis suffered from a spike in spam and scam emails, text messages, and phone calls.

153. Plaintiff Louis fears for his personal financial security and worries about the information belonging to him that was exposed in the Data Breach.

154. Because of Defendant's Data Breach, Plaintiff Louis has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Louis's injuries are precisely the type of injuries that the law contemplates and addresses.

155. Plaintiff Louis suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

156. Plaintiff Louis suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

157. Plaintiff Louis suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Louis's Private Information right in the hands of criminals.

158. Because of the Data Breach, Plaintiff Louis anticipates spending considerable amounts of time and money to try to mitigate his injuries.

159. Today, Plaintiff Louis has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

<u>David Ramirez</u>

160. Plaintiff David Ramirez, when searching for a vehicle, was required by Defendant to input his Private Information into Defendant's website to access vehicle search results.

161. Thus, Defendant obtained and maintained Plaintiff Ramirez's Private Information.

162. Defendant maintained Plaintiff Ramirez's Private Information when Defendant's databases were breached. As a result, Plaintiff Ramirez was injured by Defendant's Data Breach.

163. Plaintiff Ramirez is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

164. Plaintiff Ramirez provided his Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Ramirez's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

165. Worryingly, Plaintiff Ramirez received an Experian alert stating that his Private Information was on the dark web around the time after the Data Breach.

166. Thus, on information and belief, Plaintiff Ramirez's Private Information has already been published by cybercriminals on the dark web.

167. Through its Data Breach, Defendant compromised Plaintiff Ramirez's Private Information.

168. Plaintiff Ramirez has *already* suffered from identity theft and fraud since the Data Breach—whereby he has experienced fraudulent charges on both his debit and credit cards. Plaintiff Ramirez's credit score also dropped during this time.

169. Plaintiff Ramirez has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

170. In the aftermath of the Data Breach, Plaintiff Ramirez suffered from a spike in spam and scam emails, text messages, and phone calls.

171. Plaintiff Ramirez fears for his personal financial security and worries about what information was exposed in the Data Breach.

172. Because of Defendant's Data Breach, Plaintiff Ramirez has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Ramirez's injuries are precisely the type of injuries that the law contemplates and addresses.

173. Plaintiff Ramirez suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

174. Plaintiff Ramirez suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

175. Plaintiff Ramirez suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Ramirez's Private Information right in the hands of criminals.

176. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

177. Today, Plaintiff Ramirez has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

<u>Scott Weiscope</u>

178. Plaintiff Scott Weiscope used Defendant's website to search for vehicles and was required by Defendant to input personal information to complete his search.

179. Thus, Defendant obtained and maintained Plaintiff Weiscope's Private Information.

180. Defendant maintained Plaintiff Weiscope's Private Information when Defendant's databases were breached. As a result, Plaintiff Weiscope was injured by Defendant's Data Breach.

181. Plaintiff Weiscope is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

182. Plaintiff Weiscope provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Weiscope's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

183. Plaintiff Weiscope reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

184. Plaintiff Weiscope does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

185. Worryingly, Plaintiff Weiscope received an email from a credit-reporting entity about Defendant and the dark web.

186. Thus, on information and belief, Plaintiff Weiscope's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

187. Through its Data Breach, Defendant compromised Plaintiff Weiscope's Private Information.

188. Plaintiff Weiscope has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

189. Plaintiff Weiscope fears for his personal financial security and worries about the information belonging to him that was exposed in the Data Breach.

190. Because of Defendant's Data Breach, Plaintiff Weiscope has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Weiscope's injuries are precisely the type of injuries that the law contemplates and addresses.

191. Plaintiff Weiscope suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

192. Plaintiff Weiscope suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

193. Plaintiff Weiscope suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Weiscope's Private Information right in the hands of criminals.

194. Because of the Data Breach, Plaintiff Weiscope anticipates spending considerable amounts of time and money to try to mitigate his injuries.

195. Today, Plaintiff Weiscope has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

<u>Chad Williams</u>

196. Plaintiff Chad Williams used Defendant's website to search for vehicles and apply for financing and was required by Defendant to input his Private Information to receive and apply for these services.

197. Specifically, upon applying for financing with Defendant in 2025 and 2026, Plaintiff Williams provided Defendant with his full name, contact information, Social Security number, financial account information, and other information requested by Defendant.

198. Thus, Defendant maintained Plaintiff Williams's Private Information in its systems at the time of the Data Breach.

199. Plaintiff Williams was injured by Defendant's Data Breach.

200. Plaintiff Williams is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

201. Plaintiff Williams provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Williams's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

202. Plaintiff Williams reasonably understood that a portion of the funds paid to Defendant (and/or derived from his employment) would be used to pay for adequate cybersecurity and protection of Private Information.

203. Upon learning of the Data Breach, Plaintiff Williams subscribed to credit monitoring which costs him $20 per month. He also spent time implementing a credit freeze using that service.

204. Since the Data Breach, Plaintiff Williams suffered from a significant increase in unwanted spam calls, texts, and emails, and he has been notified that his Private Information was

found on the dark web from the credit monitoring service he enrolled in following the Data Breach.

205. Plaintiff Williams's credit score also dropped following the Data Breach, which has negatively impacted Plaintiff Williams's ability to obtain financing and created further problems for Plaintiff Williams.

206. Plaintiff Williams does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

207. Through its Data Breach, Defendant compromised Plaintiff Williams's Private Information.

208. Plaintiff Williams has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. He has already spent several hours researching the data breach and the best way to protect his Private Information from misuse.

209. Plaintiff Williams fears for his personal financial security and worries about the information belonging to him that was exposed in the Data Breach.

210. Because of Defendant's Data Breach, Plaintiff Williams has suffered—and will continue to suffer from—heightened anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Williams's injuries are precisely the type of injuries that the law contemplates and addresses.

211. Plaintiff Williams suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

212. Plaintiff Williams suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

213. Plaintiff Williams suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Williams's Private Information right in the hands of criminals.

214. Because of the Data Breach, Plaintiff Williams anticipates spending considerable amounts of time and money to try to mitigate his injuries.

215. Today, Plaintiff Williams has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

216. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

h. continued risk to their Private Information, which remains in Defendant's possession and is thus at risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

217. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up to $1,000.00 depending on the type of information obtained.

218. The value of Plaintiffs and Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "dark web"— further exposing the information.

219. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the Private Information far and wide.

220. One way that criminals profit from stolen Private Information is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross- referencing and combining two sources of data—first the stolen Private Information, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

221. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

222. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to

unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

223. Defendant disclosed the Private Information of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the Private Information of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen Private Information.

224. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

***Consumers Prioritize Data Security***

225. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[15] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer

[15] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO 2024 CONSUMER PRIVACY SURVEY (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf.

respondents saying they won't purchase from an organization they don't trust with their data."[16]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[17]

c. 89% of consumers stated that "I care about data privacy."[18]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[19]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[20]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[21]

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

226. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

227. According to the *2023 Annual Data Breach Report*, the number of data compromised in 2023 nearly doubled compared to 2022.[22] And in 2023, a record 3,205 breaches

---

[16] *Id*. at 3.
[17] *Id*.
[18] *Id*. at 9.
[19] *Id*.
[20] *Id*.
[21] *Id*. at 11.
[22] *Identity Theft Resource Center 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High*, IDENTITY THEFT RESOURCE CENTER (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/.

occurred, exposing the data of approximately 353,027,892 victims.[23]

228. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[24]

229. Cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack.[25]

230. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

231. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

232. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[26] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep.

---

[23] *Id.*

[24] Identity Theft Resource Center, *Identity Theft Resource Center 2024 Data Breach Report* at 6 (Jan. 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/.

[25] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019, 9:44 PM EST), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[26] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

b. properly dispose of personal information that is no longer needed.

c. encrypt information stored on computer networks.

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

233. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

234. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction.

b. limit access to sensitive data.

c. require complex passwords to be used on networks.

d. use industry-tested methods for security.

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

235. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

236. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to customers' data constitutes an unfair act or practice

prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

237. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all customers; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which customers can access sensitive data.

238. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

239. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

240. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

**CLASS ACTION ALLEGATIONS**

241. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3),

individually and on behalf of all members of the following classes (together, referred to as the "Class"):

> **Nationwide Class:** All individuals residing in the United States whose Private Information was compromised in the CarGurus Data Breach discovered in February 2026, including all individuals who received notice of the Breach.

> **California Subclass:** All individuals residing in the California whose Private Information was compromised in the CarGurus Data Breach discovered in February 2026, including all individuals who received notice of the Breach.

242. Excluded from the Class are CarGurus and its subsidiaries and affiliates, officers, directors, and members of their immediate families, and any entity in which it has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

243. Plaintiffs reserve the right to amend the class definition.

244. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

245. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

246. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least thousands of members.

247. Typicality. Plaintiffs' claims are typical of Class Members' claims as each claim arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

248. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

249. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class-wide proceeding can answer for all Class Members. In fact, a class-wide proceeding is necessary to answer the following questions:

a. whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Private Information;

b. whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. whether Defendant was negligent in maintaining, protecting, and securing Private Information;

d. whether Defendant breached contract promises to safeguard Plaintiffs' and the Class's Private Information;

e. whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. whether Defendant's Breach Notice was reasonable;

g. whether the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. whether Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

250. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

251. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

252. Plaintiffs and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

253. Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Private Information in a data breach. And

here, that foreseeable danger came to pass.

254. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if their Private Information was wrongfully disclosed.

255. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' Private Information.

256. Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in its care and custody.

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized.

c. promptly detect attempts at unauthorized access.

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

257. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

258. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

259. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

260. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

261. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant held vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information—whether by malware or otherwise.

262. Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

263. Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

264. Defendant breached these duties as evidenced by the Data Breach.

265. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

266. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' injury.

267. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

268. Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

269. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including fraud, monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

270. Defendant's breach of its common law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and

remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiffs and the Nationwide Class)**

271. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

272. Pursuant to the FTCA, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's Private Information.

273. Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, customers' Private Information. The FTC publications and orders promulgated pursuant to the FTCA also form part of the basis of Defendant's duty to protect Plaintiffs' and the members of the Class's Private Information.

274. Defendant breached its duties to Plaintiffs and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

275. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

276. Defendant violated its duty under Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and the Class's Private Information and not complying

with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

277. The harm that has occurred is the type of harm the FTCA is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

278. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including fraud, monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

279. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

280. Defendant's various violations and its failure to comply with applicable laws and regulations constitute negligence *per se* under applicable states' law.

281. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

282. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

283. Plaintiffs and Class Members were required to provide their Private Information to Defendant as a condition of receiving services and/or employment from Defendant. Plaintiffs and Class Members provided their Private Information to Defendant in exchange for Defendant's services and/or employment.

284. Plaintiffs and Class Members reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity measures.

285. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

286. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant in exchange for services.

287. In turn, and through internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

288. In its Privacy Policy, Defendant represented that it had a legal duty to protect Plaintiffs' and Class Member's Private Information.

289. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

290. After all, Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

291. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

292. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

293. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

294. Defendant materially breached the contracts it entered with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information;

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

295. In these and other ways, Defendant violated its duty of good faith and fair dealing.

296. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

297. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

298. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

299. This claim is pleaded in the alternative to the breach of implied contract claim.

300. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) Plaintiffs' and the Class's payments and/or employment and (2) using their Private Information to facilitate its business operations.

301. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members. And Defendant benefited from Plaintiffs and the Class's payment and/or employment and from receiving Plaintiffs' and Class Members' Private Information, as this was used to provide services and facilitate its business operations.

302. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

303. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

304. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of

Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

305. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' payment and/or employment because Defendant failed to adequately protect their Private Information.

306. Plaintiffs and Class Members have no adequate remedy at law.

307. Defendant should be compelled to disgorge into a common fund - for the benefit of Plaintiffs and Class Members - all unlawful or inequitable proceeds that it received because of its misconduct.

**<u>FIFTH CAUSE OF ACTION</u>**
**Violation Of California's Unfair Competition Law**
**Bus. & Prof. Code § 17200 *et seq*. ("UCL")**
**(On Behalf of Plaintiffs Arden and Ramirez and the California Subclass)**

308. Plaintiffs Arden and Ramirez ("Plaintiffs" for purposes of this claim) incorporate by reference all other paragraphs as if fully set forth herein. Plaintiffs bring this claim on behalf of members of the California Subclass.

309. Plaintiffs plead this claim for equitable relief, including restitution and injunctive relief, in the alternative to their claims for damages.

310. CarGurus is a "person" under Cal. Bus. & Prof. Code § 17201.

311. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

312. CarGurus' acts, omissions, and conduct, as alleged herein, constitute "business practices" within the meaning of the UCL.

313. CarGurus' actions as alleged herein constitute an "unlawful" practice as

encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq*. because its actions: (a) constituted negligence and unjust enrichment; (b) constituted breach of implied contract; (c) violated the California Consumer Privacy Act; (d) violated the California Customer Records Act; (e) violated California consumer protection laws; and (f) violated federal law and regulations, including the FTCA.

314. CarGurus' actions as alleged herein also constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq*., because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious. The harm caused by CarGurus' wrongful conduct outweighs any utility of such conduct and has caused - and will continue to cause - substantial injury to the California Subclass, including Plaintiffs. There were ample reasonably available alternatives that would have furthered CarGurus' legitimate business practices, including using industry-standard technologies to protect data (*e.g.*, multi-factor authorization, effective encryption and anonymization, compartmentalization of sensitive data, software patches, limiting how much data any user may access, and the purging of data no longer necessary for CarGurus' services). CarGurus also unreasonably delayed in notifying Plaintiffs and the California Subclass Members regarding the unauthorized release and disclosure of their Private Information.

315. CarGurus profited from their unfair conduct without incurring the costs associated with maintaining a system for the storage of Private Information with adequate data security.

316. CarGurus' conduct also is deceptive in violation of the UCL. CarGurus' fraudulent business acts and practices include:

a. Failing to adequately secure the personal information of Plaintiff and California Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b. Enabling the disclosure of personal and sensitive facts about Plaintiff and California Subclass Members in a manner highly offensive to a reasonable person;

c. Enabling the disclosure of personal and sensitive facts about Plaintiff and California Subclass Members without their informed, voluntary, affirmative, and clear consent; and

d. Omitting, suppressing, and concealing the material fact that Defendants did not reasonably or adequately secure Plaintiffs' and California Subclass Members' personal information.

317. CarGurus' omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of Plaintiffs' and California Subclass Members' personal information.

318. CarGurus' unlawful, unfair, and fraudulent business practices described herein; including CarGurus' security practices, marketing decisions, and privacy policies, were conceived, reviewed, approved or otherwise controlled from CarGurus' headquarters.

319. The harm from CarGurus' conduct was not reasonably avoidable by consumers. Plaintiffs and California Subclass Members were required to provide their Private Information to CarGurus to receive services and/or employment. Plaintiffs and California Subclass Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures.

320. There were reasonably available alternatives that would have furthered CarGurus' business interests of electronically maintaining their customers' and employees' information while protecting Private Information.

321. A reasonable person would regard CarGurus' derelict data security and the Data Breach as important, material facts that could and should have been disclosed.

322. As a direct and proximate result of CarGurus' unlawful, unfair, and fraudulent

conduct, Plaintiffs lost money or property because their sensitive personal information experienced a diminution of value; because they lost time to monitoring their financial accounts for fraudulent activity; because of the current and/or future costs of credit and identity theft monitoring services; and because Plaintiffs suffered damage to and a loss of their property interest and right to exclude others from their Private Information. Additionally, Plaintiffs and California Subclass Members did not receive their full benefit of the bargain, because, as a result of CarGurus' inadequate security measures, they received services and/or employment that were less valuable than what they paid for and/or entitled. Plaintiffs and California Subclass Members also face ongoing and impending damages related to theft of their Private Information.

323. CarGurus' wrongful practices constitute a continuing course of unfair competition because CarGurus has failed to remedy the lax security practices or even fully notify all affected persons. Plaintiffs and the California Subclass seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end CarGurus' wrongful practices and require CarGurus to maintain adequate and reasonable security measures to protect the Private Information of Plaintiffs and the California Subclass.

324. Further, if an injunction is not issued, Plaintiff and California Subclass Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. CarGurus has still not provided adequate information on the cause and scope of the Data Breach. Plaintiff and California Subclass Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

325. Plaintiffs and the California Subclass also seek an order requiring CarGurus to make full restitution of all monies they received through their wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq*.

326. At all relevant times, CarGurus was willfully and knowingly engaged in the use of an unlawful, unfair, and deceptive practice.

**SIXTH CAUSE OF ACTION**
**Violation Of The California Consumer Privacy Act**
**Cal. Civ. Code §§ 1798.100, *et. seq*. ("CCPA")**
**(On Behalf of Plaintiffs Arden and Ramirez, and members of the California Subclass)**

327. Plaintiffs Arden and Ramirez ("Plaintiffs" for purposes of this claim) incorporate by reference all other paragraphs as if fully set forth herein. Plaintiffs bring this claim on behalf of members of the California Subclass.

328. Plaintiffs and the members of the California Subclass are consumers as that term is defined in Cal. Civ. Code § 1798.140(i).

329. CarGurus is a business as that term is defined in Cal. Civ. Code § 1798.140(d). CarGurus is organized or operated for the profit or financial benefit of its owners. CarGurus collects consumers' personal information (including that of Plaintiffs and the California Subclass) or such information is collected on CarGurus' behalf, and CarGurus determines the purposes and means of the processing of consumers' personal information. CarGurus does business in California and had substantial annual revenue in the preceding calendar year.

330. The information accessed during the Data Breach constitutes "personal information" as that term is defined in Cal. Civ. Code § 1798.140(v)(1) and 1798.81.5 and included Social Security Numbers.

331. Under the CCPA, CarGurus had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information that it stored. Cal. Civ. Code § 1798.150(a)(1).

332. CarGurus' failure to prevent the Data Breach by implementing and maintaining reasonable security procedures and practices constitutes a breach of its duty under the CCPA.

333. As a result of the Data Breach, the nonencrypted and nonredacted personal information of Plaintiffs and the California Subclass was subject to unauthorized access and exfiltration, theft, or disclosures.

334. Plaintiffs and the California Subclass seek injunctive relief in the form of an order enjoining CarGurus from continuing to violate the CCPA pursuant to Cal. Civ. Code § 1798.150(a)(1)(B). Such injunctive relief is particularly important because CarGurus continues to hold the Private Information of Plaintiffs and the California Subclass. Plaintiffs and the California Subclass have an interest in ensuring that their Private Information is reasonably protected.

Section 1798.150(b) of the CCPA requires plaintiffs to provide a defendant with 30 days' notice before seeking statutory damages under the CCPA. In February of 2026, Plaintiff Ramirez sent Defendants a CCPA notification letter regarding this Data Breach on behalf of himself and putative California Subclass Members. Defendants have failed to provide any cure. Plaintiffs and California Subclass Members therefore seek actual damages or statutory damages of $750 per consumer under section 1798.150(a)(1)(A).And on May 29, 2026, In February of 2026, Plaintiff Ramirez sent Defendants a CCPA notification letter regarding this Data Breach on behalf of himself and putative California Subclass Members.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Certifying the California Subclass as a class action on behalf of Plaintiffs Arden and Ramirez and the proposed California Subclass, appointing them as class representatives for the California Subclass, and appointing their counsel to represent the California Subclass;

C. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

E. Enjoining Defendant from further unfair and/or deceptive practices;

F. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

G. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

H. Awarding attorneys' fees and costs, as allowed by law;

I. Awarding prejudgment and post-judgment interest, as provided by law;

J. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

K. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims so triable.

Dated: May 29, 2026

Respectfully submitted,

By: *<u>/s/ Raina C. Borrelli</u>*
Raina C. Borrelli (*pro hac vice*)

**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Casondra Turner (MA BBO# 687682)
**MILBERG PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, Georgia 30303
Tel: (771) 772-3086
cturner@milberg.com

Jason S. Rathod (*pro hac vice*)
**MIGLIACCIO & RATHOD, LLP**
412 H Street, NE, Suite 302
Washington, DC 20002
Phone: (202) 470-520
Fax: (202) 800-2730
jrathod@classlawdc.com

Gerald D. Wells, III (*pro hac vice*)
**LYNCH CARPENTER, LLP**
1760 Market Street, Suite 600
Philadelphia, PA 19103
Phone: (267) 609-6910
Fax: (267) 609-6955
jerry@lcllp.com

Charles E. Schaffer (*pro hac vice*) **LEVIN SEDRAN & BERMAN LLP** 510 Walnut Street, Suite 500 Philadelphia, PA 19106
Phone: (215) 592-1500
cschaffer@lfsblaw.com

Ronald Podolny (*pro hac vice forthcoming*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Phone: (813) 424-5633
ronald.podolny@forthepeople.com

Andrew Ferich (*pro hac vice forthcoming*)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Phone: (310) 474-9111
Fax: (310) 474-8585
aferich@ahdootwolfson.com

*Executive Committee for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Raina C. Borrelli, hereby certify that on May 29, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, via the ECF system.

DATED this 29th day of May, 2026.

STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*

Raina C. Borrelli
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com